IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

VERA WALKER,                          )
                                      )
            Plaintiff,                )
                                      )
        v.                            )     Case No.
                                      )     15-3075-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Vera Walker seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Title II of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in discrediting

plaintiff's treating physician and the medical expert and improperly assessed her

residual functional capacity.  I find that the substantial evidence in the record as a

whole does not support the ALJ's finding that plaintiff is not disabled; therefore,

plaintiff's motion for summary judgment will be granted and the decision of the

Commissioner will be reversed.

## I.     BACKGROUND

On June 9, 2011, plaintiff applied for disability benefits alleging that she had

been disabled since April 7, 2011.  Plaintiff's application was denied on September 9,

2011.  On August 14, 2013, a hearing was held before an Administrative Law Judge.

On September 23, 2013, the ALJ found that plaintiff was not under a "disability" as

defined in the Act.  On December 14, 2014, the Appeals Council denied plaintiff's

request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the

2

courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

            Yes = not disabled.
            No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

No = not disabled.
Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff, vocational expert Kelly Bartlett,

and medical expert Rueben Beezy, M.D., in addition to documentary evidence admitted

at the hearing.

### A.      EARNINGS RECORD

The record shows that plaintiff earned the following income from 1967 through

2012:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1967 | $ 124.50 | 1990 | $ 12,178.62 |
| 1968 | 0.00 | 1991 | 13,205.80 |
| 1969 | 403.90 | 1992 | 12,820.00 |

4

| | | | |
|---|---|---|---|
| 1970 | 0.00 | 1993 | 13,579.12 |
| 1971 | 282.65 | 1994 | 14,100.28 |
| 1972 | 88.80 | 1995 | 14,980.18 |
| 1973 | 144.36 | 1996 | 15,777.99 |
| 1974 | 286.16 | 1997 | 16,940.67 |
| 1975 | 687.71 | 1998 | 15,285.42 |
| 1976 | 2,112.97 | 1999 | 11,835.47 |
| 1977 | 1,064.70 | 2000 | 14,182.65 |
| 1978 | 1,358.14 | 2001 | 10,655.85 |
| 1979 | 0.00 | 2002 | 15,668.15 |
| 1980 | 0.00 | 2003 | 15,682.99 |
| 1981 | 2,265.91 | 2004 | 17,882.15 |
| 1982 | 1,592.19 | 2005 | 15,198.72 |
| 1983 | 3,788.01 | 2006 | 15,966.07 |
| 1984 | 5,813.78 | 2007 | 16,329.51 |
| 1985 | 6,615.31 | 2008 | 17,384.84 |
| 1986 | 4,694.90 | 2009 | 17,656.85 |
| 1987 | 5,486.82 | 2010 | 16,268.76 |
| 1988 | 3,260.98 | 2011 | 8,976.55 |
| 1989 | 9,317.56 | 2012 | 0.00 |

(Tr. at 171).

5

**B.      SUMMARY OF MEDICAL RECORDS**

On August 11, 2009, plaintiff saw Dan Park, D.P.M., at St. John's Regional

Health System, after having been referred by Marcia

Graham, M.D. (Tr. at 288-290).  Plaintiff had a stress

fracture of the left cuboid evidence by a bone scan

performed the previous week.  Plaintiff had been wearing a CAM walker since July 31,



2009.  "She works as a supervisor at a cafeteria at 166 Auto

Auction.  She works three days a week, and two of the three days,

she is on her feet almost all day.  She went back to work

yesterday.  Even though she was able to finish her shift, she

couldn't walk well with pain after work."  The records indicate that

plaintiff was taking Boniva for osteoporosis and Ultram for pain.  On exam plaintiff had

pain on palpation on the back of the cuboid area.  Dr. Park reviewed the bone scan with

plaintiff and noted that it showed a stress fracture.  He recommended she continue

using the CAM walker for four more weeks and indicated she could not return to work

until September 7, 2009.  "Handicap placard is issued for 3 months.  She is not

interested in any narcotics."

On September 4, 2009, plaintiff saw Dr. Park for a follow up on her stress

fracture of the left foot (Tr. at 275-277).  Plaintiff had been wearing a CAM walker for

the past four weeks.  She reported that her foot was much improved and she would like

to go back to work.  On exam, plaintiff had pain on palpation on the back side of the

cuboid bone with some swelling.  X-rays showed a plantar heel spur.  Dr. Parks

6

assessed closed fracture of the cuboid bone.  Although plaintiff was still unable to put complete pressure on her foot, Dr. Parks released her to return to work.

On April 8, 2010, plaintiff saw Jennifer Zhai, M.D., complaining of muscle pain (Tr. at 301-303, 421-423).  Plaintiff said the pain, worse in her legs than arms, had started about two years earlier and had been getting progressively worse.  The pain wakes her up at night.  "She works part-time, after the work, her pain seems to get worse.  She states that she has good day[s] and bad days."  Plaintiff was 4'11" tall and weighed 130 pounds.  On exam she had normal gait, normal muscle tone and strength.  "I do not have multiple muscle tend[er] points to fill the criteria for fibromyalgia."  Dr. Zhai assessed inflammatory myopathy, muscular dystrophy versus fibromyalgia.  She ordered tests and indicated if they were normal she would consider a muscle biopsy due to plaintiff's family history (father and sibling with muscular dystrophy).

On April 20, 2010, plaintiff saw Robert Cavagnol, M.D., for muscle pain and weakness in her legs for "many months" (Tr. at 309-310, 334-335, 342-344).  The pain would often wake her up and occurred with walking.  On exam plaintiff had tenderness to palpation in her left thigh.  She was assessed with muscle pain and weakness, and a muscle biopsy was ordered.

On April 26, 2010, plaintiff had an open deep muscle biopsy (Tr. at 311-325, 339-340).  The specimens were sent to Washington University School of Medicine.

On May 4, 2010, plaintiff had a follow up on her muscle biopsy (Tr. at 330, 338).  The wound was noted to be healing well.  Plaintiff was instructed to wait two weeks before resuming activities.

On July 28, 2010, plaintiff saw Stanley Hayes, M.D., a rheumatoid specialist, after having been referred by Dr. Zhai (Tr. at 356-357, 368-369). Plaintiff reported chronic muscle aching and pain for the past four or five years. She said she has muscle aching and cramps in her legs all the time and significant stiffness in the morning. Her left side always hurts more than her right. The muscle biopsies did not provide any answers. Plaintiff reported chronic sleep difficulties for which she was taking Ambien. Plaintiff continued to take Boniva for osteoporosis. Dr. Hayes performed a physical exam. "There are moderate trigger points in the neck, upper back, hip, elbow, and knees." Plaintiff's gait was normal and she was able to arise from a squatting position. Dr. Hayes assessed fibromyalgia. He told her to continue using Ambien and to begin a walking program. "She'll maintain her ongoing care and management with Dr. Graham." Dr. Hayes also assessed chronic anxiety with depression.

On September 17, 2010, plaintiff had surgery to put a tube in her right eardrum due to chronic ear infection and conductive hearing loss (Tr. at 374, 378, 384).

On January 24, 2011, plaintiff was seen at the Kitchen Clinic (Tr. at 556). She reported having been in the emergency room twice in the last week due to falling down. She hurt her lower back during the fall. On this day she was nauseated and was unable to hold food down. On physical exam she was noted to have a possible bowel obstruction and was told to go to the emergency department.

On March 4, 2011, plaintiff saw Rose Breitling, a nurse practitioner, at Jordan Valley Community Health Center for complaints of anxiety and depression (Tr. at 444-

8

446).  Plaintiff was assessed with mild depression and was given a prescription for Celexa, an antidepressant.

On March 25, 2011, plaintiff saw Mary Breitling, a nurse practitioner, for a follow up on depression (Tr. at 441-443).  Plaintiff indicated the Celexa was working and she did not feel as depressed.  She wanted to continue that medication as well as her Ambien for insomnia.  She was assessed with depression and insominia and her medications were refilled.

April 7, 2011, is plaintiff's alleged onset date.

On June 8, 2011, plaintiff saw Rose Breitling, a nurse practitioner, complaining of severe leg pain and spasms, worse when she is on her feet (Tr. at 438-440).  Plaintiff had a plantar wart.  Her Flexeril was refilled.

On July 1, 2011, plaintiff saw Dawn Dean, a nurse practitioner, for complaints of dizziness (Tr. at 434-436).  Her symptoms were aggravated with turning her head to the right or left, and standing up.  Associated symptoms included headache, nausea and weakness.  On exam plaintiff had decreased strength in both her legs.  Ms. Dean assessed dizziness and recommended plaintiff see a neurologist, but plaintiff had no insurance and was unable to see a specialist.  Plaintiff was told to continue taking Ambien, Flexeril, and Boniva, and Meclizine was added for dizziness.

On July 11, 2011, plaintiff was seen at the Kitchen Clinic (Tr. at 407-408).  She reported having had a seizure in her sleep a few days earlier.  She complained of dizziness, fatigue, a bad headache, and a history of seizures with past diagnoses of epilepsy and grand mal seizures.  Plaintiff had not taken seizure medication in many

years, her last seizure had been six years earlier.  On exam plaintiff had decreased range of motion in her arms and legs.  The doctor assessed recent seizure activity, fibromyalgia, and daily headaches.  She ordered an MRI of the head and an EEG along with blood work.  She recommended plaintiff keep a headache diary and instructed her not to drive.

On July 14, 2011, plaintiff had an MRI of her brain which was unremarkable (Tr. at 414-415, 479).

That same day plaintiff had an EEG (electroencephalography) due to complaints of dizzy spells (Tr. at 418). The test was normal.

On September 9, 2011, Elissa Lewis, Ph.D., a nonexamining consulting psychologist, found that plaintiff's mental impairment is not severe (Tr. at 454-464).

On September 27, 2011, plaintiff was seen at the Kitchen Clinic for a follow up on muscle pain (Tr. at 558).  She was assessed with fibromyalgia and osteoporosis. Plaintiff was given a list of calcium-rich foods and was given a prescription for 600 mg of Calcium plus Vitamin D to take twice a day.

On December 22, 2011, plaintiff was seen at the Kitchen Clinic for left upper arm pain (Tr. at 557).  She was unable to use her left hand to wash, and the pain was interfering with her sleep. On exam she had "very limited" range of motion of her left arm. She could not abduct at all, her arm was painful at her side, and she was unable to resist downward pressure when her arm was extended.  Plaintiff was assessed with possible rotator cuff tear,



Abduction

10

osteoporosis, and fibromyalgia. She was unable to afford an MRI of her shoulder. She was given a prescription for Flexeril (muscle relaxer) and was told to take Ibuprofen.

On December 26, 2011, plaintiff had x-rays of her left shoulder and AC joints due to complaints of shoulder pain (Tr. at 643-646). The x-rays showed degenerative disease of the thoracic spine and cervical spine and mild osteoporosis.

On January 6, 2012, plaintiff saw Richard Griffith, M.D., complaining of left shoulder pain (Tr. at 545, 567-568). Plaintiff had been directed to have an MRI but she was waiting for Medicaid approval. On exam Dr. Griffith observed left shoulder tenderness, and tenderness in the biceps tendon and subdeltoid bursa. He assessed degenerative joint disease of the cervical spine and probable left shoulder. "Doubt fibromyalgia at this time." Plaintiff was assessed with chronic fatigue syndrome. Dr. Griffith prescribed Tramadol for pain.

On January 15, 2012, plaintiff was seen at the Cox South emergency room for back pain from a fall (Tr. at 636-639). She complained of low back and left sided rib pain. She was assessed with back contusion and was given a prescription for Flexeril and Lortab (narcotic) as needed for pain.

On January 18, 2012, plaintiff saw Rose Breitling, a nurse practitioner, for a follow up from her emergency room visit (Tr. at 541-543, 564-565). Her back pain continued to be severe. She had not had a bowel movement in 12 days and on exam she had no bowel sounds. Plaintiff was directed to go to the emergency department "now" for further evaluation. She was seen in the ER that day (Tr. at 626-631) and again on January 24, 2012 (Tr. at 621-624).

On February 16, 2012, plaintiff was seen at the Kitchen Clinic (Tr. at 554-555). She complained that her balance was "not good." Rodney Quinn, M.D., reviewed plaintiff's life history of epilepsy and treatment for seizures. He assessed epilepsy currently in remission. He told plaintiff not to drive until she was seizure-free and he gave her medication to take if she had another seizure.

On February 23, 2012, plaintiff was seen at the Kitchen Clinic (Tr. at 553). She had limited range of motion in her left shoulder. She was assessed with left shoulder pain.

On April 19, 2012, plaintiff was seen at the Kitchen Clinic (Tr. at 552). The records reflect that plaintiff was on Boniva for osteoporosis, and the doctor recommended that plaintiff have a bone scan.

On April 23, 2012, plaintiff was seen at the Kitchen Clinic for shoulder and left arm pain (Tr. at 551). Range of motion exercises were recommended. Samples of medication were provided.

On August 22, 2012, plaintiff saw Dorinda Faulkner, M.D., at Ozarks Community Hospital (Tr. at 466-467). Plaintiff complained of low back pain which was worse with lifting, left hip pain (worse with standing for 15 to 20 minutes or with walking), left calf cramps, hip pain with standing, difficulty sitting for long periods due to stiffness, and upper arm and shoulder pain. Plaintiff's psychological exam was normal. Dr. Faulkner performed a physical exam and noted that plaintiff was off balance when she tried to

heel/toe walk and she had trouble with her bilateral trapezius muscles.



On August 31, 2012, Dr. Faulkner completed a residual functional capacity assessment (Tr. at 469-471). She found that plaintiff could lift approximately 5 pounds frequently and 10 pounds occasionally; she could stand or walk for 2 hours per day and for 15 to 20 minutes at a time but would need to alternate sitting and standing. She found that plaintiff could sit for 8 hours per day and for 2 hours at a time. She found that plaintiff's ability to push or pull was limited and she gave the basis for that finding. She found that plaintiff was limited in her ability to reach with her right hand, and she had "no useful ability for work activities" with regard to reaching with her left arm. Plaintiff could reach overhead occasionally with her right hand but never with her left; she could reach frequently in other directions with her right hand but never with her left. Dr. Faulkner found that plaintiff would need to take unscheduled breaks as frequently as every 15 to 20 minutes depending on her activity and would likely miss more than one day of work per month.

On October 2, 2012, plaintiff saw Rose Breitling, a nurse practitioner, complaining of moderate to severe pain in her left shoulder radiating into her arm (Tr. at 537-539). She also reported fatigue and insomnia. On exam plaintiff had tenderness and reduced range of motion in her left shoulder. She was unable to lift her left arm above her head and had a painful arc test. Plaintiff's Lortab, Flexeril, Tramadol, Ambien and Boniva were refilled.

13

That same day plaintiff had x-ray of left shoulder which showed degenerative changes of the glenohumeral joint (Tr. at 549).



On December 4, 2012, plaintiff was seen by Rose Breitling, a nurse practitioner, complaining of arm pain radiating into her left shoulder (Tr. at 532-534). X-ray of left shoulder was unchanged from two months ago, and Martin Anbari, M.D, recommended an MRI as a result (Tr. at 548). Plaintiff was given a prescription for Lortab, a narcotic pain reliever.

On January 10, 2013, plaintiff saw Emily Kruse, a nurse practitioner, complaining of body aches and other symptoms (Tr. at 529-531). She also reported pain on the left side of her arm radiating down her left side. She was assessed with acute bronchitis.

On January 31, 2013, plaintiff saw William Carter, Psy.D., for complaints of anxiety (Tr. at 523-528). She was feeling overwhelmed which was worsening with her husband's recent triple bypass surgery. Plaintiff's grandson was helping with the care of plaintiff's husband. On exam, Dr. Carter observed that plaintiff appeared anxious. She weighed 116 pounds. She was assessed with generalized anxiety disorder, with an aggravating factor of difficulty accessing health care. Dr. Carter prescribed Vistaril.

On February 15, 2013, plaintiff was seen at Cox North emergency room where she was treated by Amy McCroskey, M.D., for dizziness, vertigo and a urinary tract infection (Tr. at 574-575, 614-620). Plaintiff complained of dizzy spells twice a week.

On exam Dr. McCroskey observed that plaintiff suffered a sensation of the room spinning when she looked to the left. A head CT was normal. Plaintiff reported being under a lot of stress. Plaintiff was given Meclizine for dizziness while in the emergency room and was also given a prescription for Meclizine.

On April 4, 2013, plaintiff saw Kenneth Sharlin, M.D., a neurologist (Tr. at 572-573). Plaintiff described her history of seizures which had stopped several years earlier, but then recently she had experienced an episode similar to her previous seizures. Since then she had been experiencing dizziness and positional vertigo. Dr. Sharlin performed a physical exam and assessed syncope (fainting) and vertigo. Dr. Sharlin recommended waiting to see if plaintiff experienced another seizure before beginning treatment. He provided vestibular stabilization exercises for her vertigo.

On June 5, 2013, plaintiff saw Ruth Pitts, M.D., to establish care (Tr. at 648-651, 671-672). She complained of left upper arm pain and said her shoulder "catches." It hurt more with exertion and interfered with her sleep. Plaintiff described her pain as a 7 out of 10. She was unable to lift her left arm over her head. During a review of symptoms, plaintiff reported impaired musculoskeletal function, arthralgias, joint stiffness, and muscle cramps. On exam Dr. Pitts noted decreased shoulder abduction, pain with internal and external rotation of the shoulder, decreased passive range of motion, and 3/5 strength. She assessed adhesive capsulitis of the shoulder, shoulder pain, and possible chronic rotator cuff tear. "Pt has now developed frozen shoulder." Dr. Pitts ordered an MRI and referred plaintiff to physical therapy.

On July 22, 2013, plaintiff had an MRI of her shoulder which did not show tear or impingement although impingement was not ruled out (Tr. at 654-656).

On July 27, 2013, plaintiff had an arthrogram of her right shoulder due to adhesive capsulitis (Tr. at 695-696).

## C.   SUMMARY OF TESTIMONY

During the August 14, 2013, hearing, plaintiff testified.  Rueben Beezy, M.D., testified as a medical expert and Kelly Bartlett testified as a vocational expert.

## 1.   Plaintiff's testimony.

At the time of the hearing plaintiff was 60 years of age and is currently 63 (Tr. at 29).  She completed 10th grade and did not earn a GED (Tr. at 29).  Plaintiff last worked in April 2011 as a cafeteria manager (Tr. at 29-30).  At her last job plaintiff cooked, ordered stock and put the stock up, lifted cases of chicken, and ran the cash register (Tr. at 30-31).

Plaintiff and her husband live in a house (Tr. at 31).  Their grandson used to live with them, but he graduated from high school and moved to Tulsa in early 2013 to attend college (Tr. at 31).  Plaintiff is able to do dishes, make her bed, and do a little bit of laundry (Tr. at 32).  Now that plaintiff's grandson no longer lives with her, plaintiff's grown children come over to help with things (Tr. at 32).

Plaintiff's typical day includes making her bed, preparing a light breakfast, reading a lot, maybe doing a little laundry, and on days when she feels stronger she may dust a little (Tr. at 32-33).

16

## 2. Medical expert testimony.

Medical expert Rueben Beezy, M.D., testified at the request of the Administrative Law Judge. Dr. Beezy testified that plaintiff suffers from fibromyalgia which he characterized as her most severe impairment (Tr. at 33, 34). She suffers from osteoporosis, dizzy spells, low back pain, seizure disorder although that occurs only rarely, chronic right ear infections, decreased hearing in the right ear due to right eardrum surgery, and left shoulder pain with mild degenerative joint disease of the left shoulder (Tr. at 35). Dr. Beezy noted that plaintiff had been diagnosed with fibromyalgia on "more than one occasion." (Tr. at 35). He noted that she had been diagnosed and treated for osteoporosis numerous times (Tr. at 36).

Although plaintiff's impairments do not meet or equal any listed impairments, they do create functional limitations (Tr. at 36). Plaintiff is limited to sedentary activity with occasional climbing, stooping, kneeling, crouching and crawling (Tr. at 36). She cannot climb ladders, ropes or scaffolds; she cannot work around heights or heavy machinery (Tr. at 36). She cannot reach above shoulder level with her left arm (Tr. at 36).

## 3. Vocational expert testimony.

Vocational expert Kelly Bartlett testified at the request of the Administrative Law Judge. Plaintiff's past relevant work consists of kitchen helper, DOT 318.687-010; cashier, DOT 211.462-010; short order cook, DOT 313.374-014; and stock clerk, DOT

222.387-058 (Tr. at 37). Her last job was food service supervisor, DOT 319.137-010, which was performed at the medium exertional level (Tr. at 38).

The first hypothetical involved a person with the limitations described by Dr. Beezy (Tr. at 39). Such a person could not do any of plaintiff's past relevant work (Tr. at 39). Plaintiff has the following transferable skills: inventory, ordering, and knowledge of food products and meal service (Tr. at 39). With plaintiff's transferrable skills, the person could work as a procurement clerk or a diet clerk (Tr. at 39).

The second hypothetical involved a person who could perform light level work with no ladders, dangerous heights or hazardous machinery and no reaching above shoulder level (Tr. at 39). Such a person could perform plaintiff's past relevant work as a food service supervisor at the light exertional level (Tr. at 40). Plaintiff had two previous jobs as a food service supervisor; her most recent was performed at the medium level but an earlier job was performed at the light level (Tr. at 40).

If the person were to miss three or more days of work per month, she would not be able to work (Tr. at 40). If the person needed to take an unscheduled break for ten minutes approximately every two hours in addition to the regularly scheduled morning, lunch and afternoon breaks, the person could not work (Tr. at 41-43).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Gail Reich entered her opinion on September 23, 2013 (Tr. at 11-19). Plaintiff's last insured date was December 31, 2015 (Tr. at 13).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date of April 7, 2011 (Tr. at 13).

Step two.  Plaintiff suffers from the following severe impairments: osteoporosis, history of seizure disorder, hearing loss, and mild degenerative joint disease of the left shoulder (Tr. at 13).  The ALJ found that plaintiff's fibromyalgia is not a medically determinable impairment (Tr. at 13-14).  The ALJ found that plaintiff's lower back pain is not a medically determinable impairment (Tr. at 14).  The ALJ found plaintiff's gastroesophageal reflux disease, history of chronic right ear infection, history of cancer of the soft palate and surgical resection, history of hysterectomy, and history of depression and anxiety not severe as they pose no limitation on her ability to perform work functions (Tr. at 14-15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four.  Plaintiff retains the residual functional capacity "to perform at the much reduced level of light work" including lifting up to 20 pounds occasionally and 10 pounds frequently, standing or walking up to 6 hours in an 8-hour workday, and sitting up to 6 hours in an 8-hour workday, with the following restrictions:  she can only occasionally perform postural activities; she must avoid ladders, dangerous heights and hazardous machinery; and she must not reach above the shoulder with her left upper extremity. (Tr. at 16).  With this residual functional capacity plaintiff is capable of returning to her past relevant work as a food service supervisor (Tr. at 18).

## VI.    ANALYSIS

The residual functional capacity is defined as what the claimant can do despite her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(a).  The residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities on a regular and continuing basis -- i.e., eight hours a day, five days a week.  SSR 96-8p. It is the ALJ's responsibility to determine the claimant's residual functional capacity based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of her limitations.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  A residual functional capacity determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record."  20 C.F.R. § 404.1527(b); see also Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009).

All medical opinions, whether by treating or consultative examiners, are weighed based on (1) whether the provider examined the claimant; (2) whether the provider is a treating source; (3) the length of treatment relationship and frequency of examination, including the nature and extent of the treatment relationship; (4) supportability of the opinion with medical signs, laboratory findings, and explanation; (5) consistency with the record as a whole; (6) specialization; and (7) other factors which tend to support or

Case 6:15-cv-03075-REL   Document 13   Filed 03/01/16   Page 20 of 23

contradict the opinion. 20 C.F.R. § 404.1527(c). Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole," Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007), but will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c); SSR 96-2p; see also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). All evidence from nonexamining sources is considered to be opinion evidence. 20 C.F.R. § 404.1527(e).

The ALJ discredited the opinion of plaintiff's treating physician Dorinda Faulkner, M.D., because despite the medical records including a physical exam, the ALJ found that the "notations in Dr. Faulkner's progress note appear to be subjective in nature." Yet there are no treatment records which contradict the findings of Dr. Faulkner, and her findings are consistent with the testimony of both plaintiff and medical expert Rueben Beezy, M.D.

The ALJ discredited the opinion of Dr. Beezy because it was "inconsistent" (Tr. at 13). The ALJ discredited all of Dr. Beezy's testimony because she found insufficient

objective clinical findings in the record with regard to plaintiff's lower back pain and fibromyalgia, two of the impairments about which Dr. Beezy testified (Tr. at 13-14). The ALJ acknowledges that plaintiff was assessed with fibromyalgia numerous times by her treating doctors; however, the mention on two occasions that treating doctors doubted plaintiff had fibromyalgia was found to be problematic. However, one of those instances occurred prior to plaintiff's alleged onset date, and the other resulted in a diagnosis of chronic fatigue syndrome instead of fibromyalgia. The ALJ also reasoned that "no symptom . . . by itself can constitute a medically determinable impairment" (citing SSR 96-4p) and therefore Dr. Beezy's findings are not credible because he considered plaintiff's lower back pain to be a severe impairment.

Regardless of whether plaintiff was properly diagnosed with fibromyalgia versus chronic fatigue syndrome and regardless of whether her back pain was a symptom or a diagnosis, the fact remains that plaintiff suffered symptoms which impact her ability to perform work activities, and Dr. Beezy testified about precisely that. There is no medical evidence in the record which contradicts Dr. Beezy's testimony with regard to plaintiff's functional restrictions. His testimony is consistent with the doctors and nurse practitioners who treated plaintiff before and after her alleged onset date, and it is consistent with the opinion of treating physician Dorinda Faulker, M.D.

For these reasons, I find that the ALJ erred in discrediting the opinions of Dr. Faulker and Dr. Beezy. Because the vocational expert testified that a person which the limitations described in these opinions would be unable to perform substantial gainful

activity, the ALJ's finding that plaintiff is not disabled is not supported by substantial evidence in the record as a whole.

## VII.    CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted.  It is further

ORDERED that the decision of the Commissioner is reversed and this case is remanded for an award of benefits.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 29, 2016

Case 6:15-cv-03075-REL   Document 13   Filed 03/01/16   Page 23 of 23